# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **MARV W. HUBBARD,** | ) | |
| Plaintiff | ) | Civil Action No. 2:20cv00025 |
| | ) | |
| v. | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| **KILOLO KIJAKAZI,**[1] | ) | |
| **Acting Commissioner of Social** | ) | By:  PAMELA MEADE SARGENT |
| **Security,** | ) | United States Magistrate Judge |
| Defendant | | |

### *I. Background and Standard of Review*

Plaintiff, Marv W. Hubbard, ("Hubbard"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying his claims for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C. §§ 423 and 1381 *et seq.* Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition. Neither party has requested oral argument; therefore, this case is ripe for decision.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Federal Rules of Civil Procedure Rule 25(d), Kilolo Kijakazi is substituted for Andrew Saul as the defendant in this suit.

514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Hubbard protectively filed his applications for DIB and SSI on June 16, 2017, alleging disability as of April 1, 2015, based on a fractured L4 vertebra, two bulging discs and a herniated disc and depression. (Record, ("R."), at 15, 243-50, 288.) The claims were denied initially and upon reconsideration. (R. at 149-51, 156-58, 162-63, 165, 167-69, 171-76, 178-80.) Hubbard then requested a hearing before an administrative law judge, ("ALJ"). (R. at 182-83.) A hearing was held on August 20, 2019, at which Hubbard was represented by counsel. (R. at 44-81.)

By decision dated October 2, 2019, the ALJ denied Hubbard's claims. (R. at 15-37.) The ALJ found that Hubbard met the nondisability insured status requirements of the Act for DIB purposes through December 31, 2020.[2] (R. at 17.) The ALJ found that Hubbard had not engaged in substantial gainful activity since April 1, 2015, the alleged onset date. (R. at 17.) The ALJ determined that Hubbard had severe impairments, namely lumbar spine degenerative disc disease, status-post compression fracture at L4; depressive disorder; anxiety disorder; and borderline intellectual functioning, but she found Hubbard did not have an impairment or

---

[2] Therefore, Hubbard must show that he was disabled between April 1, 2015, the alleged onset date, and October 2, 2019, the date of the ALJ's decision, to be eligible for DIB benefits.

combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 17-18.) The ALJ found Hubbard had the residual functional capacity to perform simple, repetitive, unskilled light[3] work, except he could lift or carry 20 pounds occasionally and 10 pounds frequently; stand for six hours in an eight-hour workday; walk for six hours in an eight-hour workday; sit for six hours in an eight-hour workday; push or pull occasionally; never climb ladders, ropes or scaffolds; occasionally balance, kneel, crawl, stoop, crouch and climb ramps or stairs; occasionally interact with the general public, co-workers and supervisors; he must avoid exposure to hazardous machinery, working at unprotected heights and working on vibrating surfaces; he could concentrate for two-hour segments with normal breaks as allowed by the employer; he could complete an eight-hour workday and 40-hour workweek; he could respond appropriately to supervision and work situations; and any time off task would be accommodated by normal breaks. (R. at 23.) The ALJ found Hubbard was unable to perform his past relevant work. (R. at 35.) Based on Hubbard's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found a significant number of jobs existed in the national economy that Hubbard could perform, including those of an assembler, a packing line worker and a laundry worker. (R. at 35-36.) Thus, the ALJ concluded that Hubbard was not under a disability as defined by the Act from April 1, 2015, through the date of the decision, and he was not eligible for SSI and DIB benefits. (R. at 37.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2020).

---

[3] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, he also can perform sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2020).

After the ALJ issued her decision, Hubbard pursued his administrative appeals, (R. at 236-39), but the Appeals Council denied his request for review. (R. at 1-5.) Hubbard then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2020). This case is before this court on Hubbard's motion for summary judgment filed April 12, 2021, and the Commissioner's motion for summary judgment filed May 3, 2021.

## II. Facts

Hubbard was born in 1971, (R. at 243, 245), which classifies him as a "younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c). Hubbard has a ninth-grade education[4] and past work experience as a power line worker for an electrical company. (R. at 48, 73, 271.) He stated he received a compression fracture to his lumbar spine while at work in March 2013. (R. at 49, 65.) After that time, he was placed on light duty, which, according to Hubbard, meant he was paid to "show up … and do absolutely nothing." (R. at 50, 65.) He stated this continued until April 2015,[5] when his employer informed him it could no longer accommodate his injuries. (R. at 49-50, 65.) According to Hubbard, he could no longer work due to decreased lifting ability and an inability to sit and stand for long periods due to pain.

---

[4] On Hubbard's Disability Report, he indicated he completed the tenth grade. (R. at 289.) However, at his hearing, he testified he did not complete the tenth grade and had not received his General Educational Development, ("GED"), diploma. (R. at 48.) Under the regulations, therefore, Hubbard has a "limited education," which is defined as "ability in reasoning, arithmetic, and language skills, but not enough to allow a person with these educational qualifications to do most of the more complex duties needed in semi-skilled or skilled jobs. We generally consider that a 7th grade through the 11th grade level of formal education is a limited education." 20 C.F.R. §§ 404.1564(b)(3), 416.964(b)(3) (2020).

[5] The Workers' Compensation documentation states that Hubbard was laid off on May 4, 2015, as he no longer could be accommodated. (R. at 481.)

(R. at 51.) He estimated he could lift up to 10 pounds, stand up to 15 minutes and walk up to 15 to 20 yards before having pain, as well as right leg numbness. (R. at 51, 58.) When questioned further, Hubbard admitted he did not know how far 15 yards was, but he conceded he walked "a lot longer than 15 yards" to get inside to the hearing room from the parking lot. (R. at 58.) He estimated he could sit for up to 30 minutes on a "good day," which he defined as not being in as much pain. (R. at 59.) He stated he had been restricted from lifting, pushing or pulling greater than 25 pounds.[6] (R. at 55.) Although Hubbard stated he currently was not using any assistive device, he had used a cane in the past when he was "hurting more than usual" and because his right leg would buckle, causing him to fall. (R. at 51-53.) He also stated he used a cane when walking, which was not prescribed by a physician, for about six months following his work injury. (R. at 52-53.) Hubbard stated he had used Oxycodone multiple times daily since his alleged onset date, and this medication made him drowsy. (R. at 53, 61, 67-69.) He testified that being on his feet, bending over to tie his shoes and carrying a gallon of milk aggravated his pain, and he stated he could not bend or stoop at all. (R. at 60, 70.) Hubbard, who is right-hand dominant, testified his right hand stayed numb, and he had to carry a gallon of milk with both hands due to pain, numbness and grip issues. (R. at 60, 63, 67.) In addition to pain medication, he stated he would soak in a hot bath and use over-the-counter pain patches to alleviate his pain. (R. at 62-63.) Hubbard testified lying on his right side was the most comfortable position for him, and he either laid down or reclined for two to three hours in an eight-hour day. (R. at 63.) He also testified he had experienced right shoulder blade pain for about a year, not helped by exercises. (R. at 63-64.)

---

[6] This appears to be the restrictions included in the Workers' Compensation settlement, approved on February 4, 2016. (R. at 448-52.)

Hubbard also testified he experienced depression and anxiety, for which he took Klonopin and saw Crystal Burke for counseling. (R. at 53, 61, 67.) However, he stated he had not sought emergent treatment or been hospitalized due to his mental health impairments. (R. at 54.) Hubbard described his depression as feeling hopeless and useless and having crying spells and memory issues. (R. at 54, 69-70.) He described feeling nervous around strangers and when around five or more people. (R. at 61-62, 69.) Specifically, Hubbard stated he would get sweaty, cold and nervous, and his heart would pound. (R. at 62.) If there was a lot of noise, he would "almost puke." (R. at 62.) According to Hubbard, this did not only occur around crowds, and he experienced such anxiety at least three times weekly. (R. at 62.) He stated these episodes left him feeling worn out for at least 12 hours. (R. at 62.)

Contrary to information contained in his 2017 Function Report, Hubbard testified he no longer shopped for groceries, he no longer drove, and he did not get out of the house. (R. at 54-55, 57, 297-304.) He also stated he did not cook or clean, but he fixed himself cereal and watched television. (R. at 57.)

Asheley Wells, a vocational expert, was present and testified at Hubbard's hearing. (R. at 72-80.) Wells classified Hubbard's past work as a power line worker as skilled and heavy.[7] (R. at 73.) Wells testified that a hypothetical individual of Hubbard's age, education and work history, who could perform light work, except he could never climb ladders, ropes and scaffolds; who could occasionally climb ramps and stairs, balance, kneel, crawl, stoop and crouch; and who must avoid all exposure to hazardous machinery, work at unprotected heights and work on

---

[7] Heavy work involves lifting no more than 100 pounds at a time with frequent lifting or carrying of items weighing up to 50 pounds. If someone can do heavy work, he also can do medium, light and sedentary work. *See* 20 C.F.R. §§ 404.1567(d), 416.967(d) (2020).

vibrating surfaces, could not perform Hubbard's past work, but could perform other jobs existing in significant numbers in the national economy, including those of an assembler, a packing line worker and a laundry worker. (R. at 73-74.) Wells next testified that the same hypothetical individual, but who could understand, remember and carry out simple instructions in repetitive, unskilled work; who could attend, persist and concentrate for two-hour segments with normal breaks as allowed by the employer, but could complete a normal eight-hour workday and 40-hour workweek, involving occasional interactions with the general public, co-workers and supervisors; and who could respond appropriately to supervision and co-workers in usual work situations, could not perform Hubbard's past work, but could perform the jobs previously cited. (R. at 74-75.) Next, Wells testified that the same individual, but who could stand and walk no more than two hours in an eight-hour workday, could not perform Hubbard's past work, but could perform the sedentary[8] jobs of an assembler, a weight tester and a cuff folder, all existing in significant numbers in the national economy. (R. at 75-76.) She testified that an individual who would be off task from 11 to 20 percent of the workday, or who would be absent two days or more monthly, could not perform competitive work. (R. at 76.) Wells also testified that an individual with the restrictions set forth in the November 4, 2017, opinion of Dr. Shaun Hines, D.O., (R. at 1057), could not perform even sedentary work on a full-time basis. (R. at 77.) When asked to consider the first hypothetical individual, but who also was extremely limited, almost to little or no contact or interaction, with supervisors, and who was limited to interacting with less than five co-workers or members of the public at a time, Wells testified that the light jobs

---

[8] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying items like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. §§ 404.1567(a), 416.967(a) (2020).

previously cited hinged on the amount of contact with a supervisor, and "the less interaction, the higher the job erosion." (R. at 78-79.) Lastly, Wells testified that an individual limited to occasional use of the dominant hand, could perform a few light jobs, but not if he also was limited to occasional interaction with the public, co-workers and supervisors. (R. at 79-80.)

In rendering her decision, the ALJ reviewed records from Dr. Cheryl Arenella, M.D., a state agency physician; Dr. Richard Surrusco, M.D., a state agency physician; Joseph Leizer, Ph.D., a state agency psychologist; Howard S. Leizer, Ph.D., a state agency psychologist; Whitesburg Appalachian Regional Hospital; Department of Workers' Compensation; Crystal Burke, L.C.S.W.; Tru-Care Medical Clinic; Dr. Shaun Hines, D.O.; Dr. Virginia A. Baluyot, M.D.; Norton Community Hospital; Appalachian Rehabilitation Team, Inc.; Simpson Clinic, LLC; Pikeville Medical Center; Appalachian Regional Healthcare; and Arthur W. Stair, III, M.A., S.P.E., a licensed senior psychological examiner.

An MRI of Hubbard's lumbar spine, dated November 21, 2008, showed mild degenerative disc disease without focal disc herniation or significant central canal stenosis. (R. at 373.) A treatment note from October 12, 2010, when Hubbard presented to the emergency department at Norton Community Hospital with complaints of chest pain, indicates he suffered from chronic low back pain at that time, for which he was taking Lortab. (R. at 1238-39.) An MRI of Hubbard's lumbar spine, dated April 11, 2013, showed an acute 25 percent compression fracture of the L4 vertebra, after lifting a trailer at work on March 27, 2013. (R. at 480, 1316.) X-rays of the lumbar spine, dated April 23, 2013, showed a compression fracture deformity involving the L4 vertebral body with mild retrolisthesis of L1 on L2 and disc space narrowing at L5-S1. (R. at 358.) On May 13, 2013, Dr. William J. Lester,

M.D., restricted Hubbard from lifting more than 15 pounds and from pushing/pulling more than 25 pounds. (R. at 346.) Hubbard underwent physical therapy from May 20 to July 22, 2013, at Appalachian Rehabilitation Team, Inc. (R. at 377-407.) Over this time, Hubbard continued to complain of back pain. (R. at 377-407.)

Hubbard began treating with Dr. Virginia A. Baluyot, M.D., at Tru-Care Medical Clinic, as early as 2001.[9] From March 4, 2015, to November 12, 2018, Hubbard saw Dr. Baluyot approximately monthly for pain medication services. Over this time, Dr. Baluyot diagnosed Hubbard with chronic pain syndrome, degenerative joint disease of the spine, sleep disorder and depression with anxiety, and she refilled his medications, including oxycodone, Ultram, Ambien,[10] Lexapro and Klonopin. (R. at 987, 990, 992, 994, 996-1001, 1003-07, 1009-11, 1013-19, 1022, 1024-32, 1034, 1123-29, 1317-1421.) During the vast majority of these visits, Hubbard's examinations were normal. However, on April 30 and May 28, 2015, he had tenderness to the lower lumbosacral region, and on August 20, 2015, his blood pressure was elevated at 152/90. (R. at 1022, 1028, 1030.) At nearly all of the visits over this time, Hubbard noted he was doing well or fairly well. (R. at 992, 994, 998, 1000-01, 1003, 1005, 1009, 1011, 1015, 1017-19, 1022, 1024, 1026, 1028, 1124, 1128-29, 1329, 1345, 1353, 1355.) On March 4 and April 30, 2015, he reported his pain medication was addressing his pain and making his discomfort tolerable. (R. at 1030, 1034.) On only one occasion, on June 30, 2016, did Hubbard state his pain medication was "not holding enough." (R. at 1007.) Likewise, on all Chronic Pain

_____

[9] Dr. Baluyot completed a form for the Virginia Employment Commission, dated May 10, 2015, which indicated, among other things, she had treated Hubbard for chronic back pain since May 22, 2012. (R. at 1422.)

[10] Ambien was discontinued in August 2016 due to sleepwalking. (R. at 1004.) Ultram was discontinued in May 2017. (R. at 1363.)

Assessment forms completed by Hubbard, from May 2015 to October 2019, he indicated his pain medication was working without adverse side effects. (R. at 1318, 1320, 1323, 1325, 1327, 1336-38, 1340, 1342, 1348-50, 1352, 1354, 1356, 1358, 1360, 1362, 1365-66, 1368, 1373, 1375, 1377, 1379, 1381, 1383, 1385, 1388, 1391, 1393, 1395, 1397, 1399, 1401, 1403, 1406, 1408, 1410, 1412, 1415-16, 1418, 1420.) On multiple occasions, Hubbard stated he was working around his house, working in a garden and was able to perform activities of daily living. (R. at 990, 992, 994, 998, 1022, 1026.) In March and April 2016, Hubbard described his pain as stable. (R. at 1013, 1015.) On January 19, 2017, he reported an exacerbation of his pain, but this was after helping his daughter move from her dormitory, and by the following month, he had no complaints. (R. at 994, 996.) On June 25, 2018, Hubbard complained of pain in his fingers and his hip giving way. (R. at 1326.) With regard to Hubbard's mental health impairments, on June 2, 2016, he reported feeling anxious around people, feeling depressed and preferring to be alone. (R. at 1009.) Dr. Baluyot prescribed Lexapro, and by June 30, 2016, Hubbard stated the medication was helping his depression. (R. at 1007, 1010.)

On November 4, 2017, Dr. Shaun Hines, D.O., a consultative examiner, evaluated Hubbard's complaints of back pain at the request of Disability Determination Services. (R. at 1055-59.) Hubbard described his low back pain as a "shooting … constant dull achy pain and intermittent episodes of sharp pain." (R. at 1055.) He stated the pain radiated to his feet and was aggravated by activity, bending and lifting and was mildly alleviated by pain medication and rest. (R. at 1055.) Hubbard reported these symptoms had significantly worsened since onset in 2013, and he believed he could not tolerate a full day's work due to pain. (R. at 1055.) He stated that imaging in 2015 showed two herniations and bulging discs. (R. at 1055.) Nonetheless, Hubbard reported being independent in his activities of daily living.

(R. at 1055.) On examination, he was in no acute distress; he had no edema, cyanosis or erythema of the extremities; neurological examination was normal; he had full motor strength in all muscle groups, bilaterally, except 4/5 in the lower extremities; muscle tone was good; grip strength was full with adequate fine motor movements, dexterity and ability to grasp objects, bilaterally; sensation was intact throughout; gait and station were normal; there was no muscle asymmetry, atrophy or involuntary movements, no structural deformity, effusion, periarticular swelling, erythema, heat or swelling of any joint; straight leg raise testing was negative; he was alert and fully oriented; he was cooperative; he did not appear depressed or anxious; he communicated without deficits; recent and remote memory were intact; and insight and cognitive function were good. (R. at 1056-57.) Hubbard exhibited moderate tremors during strength testing; reflexes were reduced; he was slow to rise from a sitting position without assistance and was able to bend with moderate difficulty; and he did not wish to lie supine due to pain. (R. at 1057.)

Dr. Hines noted that Hubbard showed some obvious signs of joint tenderness in the lumbar spine during range of motion, but exhibited no signs of joint instability, joint inflammation or joint deformity; and he could sit without significant distress, walk and stand in the office. (R. at 1057.) Hubbard showed no signs of mood instability or concentration difficulty, and he was able to hold conversation, respond appropriately to questions and remember instructions. (R. at 1057.) In a range of motion assessment, Dr. Hines noted Hubbard had decreased range of motion in flexion of the lumbar spine, as well as forward elevation of the shoulder.[11] (R. at 1058-59.) He diagnosed Hubbard with back pain and suspected bulging disc, although he noted he had no imaging evidence to evaluate the extent of his back

---

[11] The record does not specify which shoulder.

disease. (R. at 1057.) Nonetheless, he opined that Hubbard was unlikely to be able to walk and/or stand for a full workday, but may be able to sit for a partial workday with allotted occasional breaks. (R. at 1057.) He further opined Hubbard's condition may be exacerbated by lifting or carrying excessive weight, and he, therefore, should be limited to less than 10 pounds. (R. at 1057.) Lastly, Dr. Hines opined Hubbard should refrain from excessive bending, stooping and crouching. (R. at 1057.)

On November 13, 2017, Joseph Leizer, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), finding Hubbard was not limited in his ability to understand, remember or apply information; to interact with others; to concentrate, persist or maintain pace; or to adapt or manage himself. (R. at 89-90.) Thus, he concluded Hubbard did not have a severe mental impairment. (R. at 89-90.)

Also on November 13, 2017, Dr. Cheryl Arenella, M.D., a state agency physician, completed a physical residual functional capacity assessment, finding Hubbard could perform light work, except he could frequently balance; occasionally climb ramps and stairs, stoop, kneel, crouch and crawl; and never climb ladders, ropes or scaffolds. (R. at 92-93.) Dr. Arenella further found Hubbard had no manipulative, visual, communicative or environmental limitations. (R. at 93.) She indicated her findings were supported by Hubbard's ongoing back pain with radiological evidence showing degenerative disc disease in the lumbar spine, resulting in a reduced range of motion of the lumbar spine and 4/5 strength in the bilateral lower extremities, but a normal gait. (R. at 92-93.)

On February 14, 2018, Dr. Baluyot completed a Patient Injury And Work Status (Medical Opinion) form, noting she currently was treating Hubbard for

chronic back pain and disc disease. (R. at 1339.) She opined Hubbard was permanently unable to work based on Dr. Hines's evaluation finding he was completely disabled due to an inability to walk and stand for a full workday because of his complaints of back pain. (R. at 1339.)

On April 20, 2018, Howard S. Leizer, Ph.D., a state agency psychologist, completed another PRTF, which mirrored that of Joseph Leizer, and concluded Hubbard did not suffer from a severe mental impairment. (R. at 120.) On April 21, 2018, Dr. Richard Surrusco, M.D., a state agency physician, completed another physical residual functional capacity assessment, which mirrored that of Dr. Arenella, except he also imposed some environmental limitations on Hubbard. (R. at 123-25.) In particular, Dr. Surrusco opined Hubbard should avoid concentrated exposure to hazards, such as machinery and heights, as well as humidity and vibration, as such things would exacerbate his conditions. (R. at 124.)

Hubbard saw Crystal Burke, L.C.S.W., a licensed clinical social worker at Appalachia Family Health, for individual counseling beginning on January 30, 2018, reporting feelings of uselessness and depression, as well as having lost interest in everything. (R. at 1070.) He reported no history of mental health treatment except for being prescribed Xanax for a few months by his primary care provider following a divorce. (R. at 1070.) A depression screening indicated moderately severe depression, and Burke encouraged Hubbard to discuss antidepressant therapy with his primary care physician. (R. at 1070-71.) On mental status examination, Hubbard's appearance/grooming were clean, neat, casual and appropriate; his mood was depressed with a flat affect; eye contact was adequate; he was fully oriented with intact thought process; judgment and insight were good; he was calm and cooperative with regular speech; he had no psychomotor agitation or retardation;

intellect was average; and he had no suicidal or homicidal thoughts. (R. at 1071-72.) Burke diagnosed Hubbard with major depressive disorder, single episode, severe, without psychotic features. (R. at 1071.) On March 1, 2018, Hubbard reported not being able to attend his daughter's college cheer competition due to his "nerves." (R. at 1067.) He reported feeling bad because he was always a "people person" and loved to get out and do things. (R. at 1067.) Hubbard reported his pain was a big part of his problem, stating his pain medication only "took the edge off." (R. at 1067.) He rated his current pain level as a seven and stated it rarely was below a five in any position. (R. at 1067.) Hubbard reported poor quality of life due to pain; feeling worthless and hopeless; often walking the floor in pain; and having difficulty dealing with stress due to his pain and finances. (R. at 1067.) He denied thoughts of self-harm. (R. at 1067.) A depression screening, again, indicated moderately severe depression. (R. at 1068-69.) On mental status examination, Hubbard's appearance/grooming was casual; he had a mildly depressed mood with a dysphoric affect; eye contact was adequate; thought process was intact; he had no paranoia or delusions; judgment and insight were fair; and he had no suicidal or homicidal thoughts. (R. at 1068.) Burke added chronic pain syndrome to Hubbard's diagnoses. (R. at 1068.)

On April 4, 2018, Hubbard reported his anxiety and pain were about the same, and he stated he was trying to engage in activities, but often felt too anxious. (R. at 1065.) The previous week, Hubbard reported going to a restaurant with family, but having to go outside for a while to wait for his wife to leave. (R. at 1065.) He reported continued feelings of uselessness and worthlessness, but he stated he was hopeful for warmer days for some outdoor activities to get him outside. (R. at 1065.) A depression screening indicated moderately severe depression. (R. at 1065.) On mental status examination, Burke noted Hubbard was well-groomed and dressed

appropriately; his mood was depressed and anxious with congruent behavior; eye contact, insight, judgment and speech all were normal; he was fully oriented; and he had no suicidal or homicidal thoughts, hallucinations, delusions or paranoia. (R. at 1065.) Burke added other symptoms and signs involving emotional state to Hubbard's diagnoses. (R. at 1063.)

On April 18, 2018, Burke completed a mental assessment of Hubbard, finding he was moderately limited in all areas of making occupational, performance and personal/social adjustments, except for maintaining personal appearance, which she found only mildly limited. (R. at 979-81.) Burke opined Hubbard would miss more than two workdays monthly due to his impairments or treatment. (R. at 981.) She did not include any medical or clinical findings to support her assessment. (R. at 980-81.) On May 7, 2018, Hubbard reported several stressors related to ongoing, chronic pain problems, as well as financial and family stressors. (R. at 1120.) In particular, Hubbard noted his mother's health was failing, and another family member had been taking financial advantage of her. (R. at 1120.) He also noted his wife was having some health problems, and he suffered an eye injury the previous day after his dog jumped on him. (R. at 1120.) Hubbard reported some ongoing problems with lack of interest with daily activities and motivation, and he stated it was a challenge to "recreate his life" with his level of pain, which resulted in more anxiety. (R. at 1120.) He also reported a deep sense of dread and, sometimes, failure. (R. at 1120.) Burke discussed coping with pain and stressors, as well as challenging Hubbard's belief of "life being over." (R. at 1120.) An anxiety scale indicated moderate anxiety, and a depression scale indicated mild depression. (R. at 1121.) On mental status examination, Hubbard was clean, neat and casual; he had a mildly anxious mood and affect; eye contact was appropriate; orientation and thought process were fully intact; he had no paranoia/delusions; judgment and insight were

fair; and he had no suicidal or homicidal ideations. (R. at 1121-22.) Burke diagnosed chronic pain syndrome; major depressive disorder, single episode, severe, without psychotic features; and anxiety disorder, unspecified. (R. at 1120.)

On January 24, 2019, Hubbard established new patient status at the Simpson Clinic, L.L.C., for pain management services.[12] (R. at 1223-32.) He reported constant low back pain with shooting pain in both legs to the toes. (R. at 1223.) Hubbard stated his pain was aggravated by increased activity and weather changes and helped by oxycodone and heat. (R. at 1223.) He also reported occasional bilateral knee pain, of no concern at that time. (R. at 1223.) Hubbard indicated no side effects from his current pain medication, including no drowsiness. (R. at 1232.) He rated his pain during the prior week as a five on a 10-point scale, with the worst being a six. (R. at 1232.) Hubbard indicated his pain medication had relieved his pain by 60 percent, resulting in better physical functioning, family relations, social relations, mood, sleep patterns and overall functioning. (R. at 1232.) He stated he walked for physical activity. (R. at 1223, 1232.) On examination, Dr. Harland Simpson, M.D., indicated Hubbard could bend to 60 degrees, sensation was intact, bilateral straight leg raise testing was negative, reflexes were 2+ throughout, he had full cervical range of motion, but with tenderness to palpation, he had tenderness to palpation in the low back, and he had effusion in both knees with tenderness to palpation. (R. at 1224.) He was clean and groomed, alert and fully oriented, and he answered questions appropriately. (R. at 1224.) Dr. Simpson diagnosed Hubbard with chronic low back pain; an L4 compression fracture from 2013; lumbar degenerative disc disease; herniated nucleus pulposus at the L4-L5 level; facet

---

[12] The court has done its best to decipher these treatment notes, many of which are handwritten and largely illegible.

arthropathy throughout the lumbar spine; bilateral L5 radiculopathy; and osteoarthritis of the right knee. (R. at 1224.)

Hubbard completed a pain medication questionnaire which indicated, among other things, he had never felt a need for higher doses of medication to treat his pain, and he had never taken more pain medication than he was supposed to take. (R. at 1229-30.) On an Opioid Risk Tool assessment, he indicated he had depression. (R. at 1231.) Dr. Simpson prescribed oxycodone, Duloxetine and Doxepin, and Hubbard signed an opioid agreement. (R. at 1224-25.) On February 18, 2019, Hubbard reported he could not tell Duloxetine was helping. (R. at 1215.) He rated his pain over the prior week between five and six, with the worst being seven. (R. at 1220.) Hubbard indicated his pain medication, which caused no side effects, resulted in 65 percent pain relief and allowed better physical functioning, family relationships, social relationships, mood, sleep patterns and overall functioning. (R. at 1220.) He complained of lumbar spine spasms, but he stated he was walking and swimming and had increased quality of life and activities of daily living. (R. at 1215, 1220.) Hubbard also reported difficulty sleeping. (R. at 1215.) Dr. Simpson found he was clean and groomed, alert and fully oriented, and he answered questions appropriately. (R. at 1215.) On examination, Hubbard walked and sat "easily,"[13] and he had tenderness to palpation of the cervical and lumbar spine. (R. at 1215.) Dr. Simpson found that, although muscle spasms decreased Hubbard's sleep, he had stable pain control. (R. at 1216.) He prescribed oxycodone, nortriptyline and Baclofen. (R. at 1216.) On March 18, 2019, Hubbard reported good pain relief that enabled him to perform activities of daily living and increased his quality of life. (R.

---

[13] It is unclear to the court whether Dr. Simpson meant Hubbard did this gently or did it without difficulty.

at 1207.) He reported continued sleep difficulty, stating the nortriptyline had not helped. (R. at 1207.) Hubbard rated his pain over the prior week as five to six, with the worst being seven. (R. at 1214.) He reported his pain medication relieved his pain 75 percent and was enough "to make a real difference in [his] life." (R. at 1214.) Hubbard again denied any adverse medication side effects. (R. at 1214.) He reported walking a mile four to five times weekly. (R. at 1214.) Hubbard again noted better physical functioning, family and social relationships, mood and overall functioning with pain medication. (R. at 1214.) Tina Wallen, F.N.P., a family nurse practitioner, noted Hubbard was clean and groomed, alert and fully oriented with an appropriate affect, and he answered questions appropriately. (R. at 1207.) On exam, he exhibited tenderness to palpation of the lumbar spine, and he walked and sat easily. (R. at 1207.) Wallen noted that Hubbard's pain was adequately controlled and stable, and she added sleep disorder and aberrant behavior[14] to his diagnoses. (R. at 1208.) She continued oxycodone, discontinued nortriptyline and prescribed clonazepam. (R. at 1208.) Hubbard was called in for a random pill count and drug screen on April 3, 2019, but could not be reached, as he had no voicemail. (R. at 1205.) He later advised he had no missed calls from the office. (R. at 1205.)

On April 17, 2019, Hubbard reported his back pain was "much worse" during the evening hours and interfered with his ability to perform activities of daily living and his quality of life. (R. at 1195.) He reported no real exercise,[15] and he stated his sleep had improved "greatly" with clonazepam. (R. at 1195.) Laura Templeton, F.N.P., a family nurse practitioner, noted Hubbard was clean and groomed, alert and fully oriented with an appropriate affect, and he answered questions appropriately.

---

[14] This diagnosis was based on Hubbard having an inaccurate pill count, which he explained by stating he had taken some medication out and left it at home. (R. at 1208.)

[15] Nonetheless, Hubbard indicated he walked two miles, three times weekly. (R. at 1202.)

(R. at 1195.) He again denied medication side effects, and he rated his average pain during the prior week as five, with the worst being six. (R. at 1202.) Hubbard indicated his pain medication was providing relief that was making "a real difference" in his life. (R. at 1202.) An anxiety questionnaire indicated between moderate and severe anxiety. (R. at 1203.) On examination, he had no edema of the lower extremities, sensation was intact in all extremities, he walked and sat "easily," and he had tenderness to palpation to the cervical and lumbar spine. (R. at 1195.) Templeton noted that Hubbard was in compliance with his pill count and that he had adequate pain relief and improved sleep. (R. at 1196.) Hubbard's diagnoses remained the same, Templeton increased his oxycodone, and she refilled his clonazepam. (R. at 1196.) That same day, Templeton completed a Patient Injury and Work Status form, indicating Hubbard was permanently unable to work per Dr. Hines's evaluation. (R. at 1233.)

On May 20, 2019, Hubbard again reported doing well on his current pain regimen, noting better pain relief since his medication was increased at his prior visit. (R. at 1297.) He stated his medication enabled him to perform activities of daily living more easily and made his pain more tolerable. (R. at 1297.) Hubbard reported his average pain the prior week was a five, with the worst being a six. (R. at 1303.) He stated his pain was relieved 75 percent with his current regimen, and it made a "real difference" in his life. (R. at 1303.) Hubbard stated he was walking several times weekly for exercise. (R. at 1297, 1303.) He denied adverse medication side effects, and his physical functioning, family and social relationships, mood, sleep patterns and overall functioning were better. (R. at 1303.) He also reported good sleep with clonazepam. (R. at 1297.) Hubbard was clean and groomed, alert and fully oriented with an appropriate affect, and he answered questions appropriately. (R. at 1297.) On examination, he walked and sat easily, and he had

tenderness to palpation in the cervical spine and left shoulder. (R. at 1297.) An anxiety questionnaire indicated less than even mild anxiety. (R. at 1304.) Wallen noted that Hubbard's pain relief was adequate, and his pain was stable. (R. at 1298.) She refilled his oxycodone and clonazepam and noted a random drug screen would be performed in two weeks. (R. at 1298.)

On May 28, 2019, Arthur W. Stair, III, M.A., a licensed senior psychological examiner, completed a psychological evaluation at Hubbard's counsel's request. (R. at 1484-91.) Hubbard reported difficultly driving due to pain, which caused him to become so nervous that he avoided driving, resulting in his missing important appointments. (R. at 1484.) He reported that, since getting injured and losing his job, he would "sit and cry" and did not enjoy things he used to, like fishing all weekend. (R. at 1485.) Hubbard stated he sometimes felt like life was not worth living, and he wished he was dead, but his kids kept him going. (R. at 1485.) He stated he was never very anxious until "all of this happened." (R. at 1485.) Hubbard reported he no longer went into stores, he became nervous when he saw a truck with a trailer, he felt like a failure, he could not focus due to pain, he got irritable and mad at his situation, and he "snap[ped]" at people. (R. at 1485.) He stated he avoided most others, even close family members, but he had a good relationship with his mother. (R. at 1485.) According to Hubbard, his wife could not understand why he was this way, which had caused problems. (R. at 1485.) He reported at least moderate anxiety, mild post-traumatic stress symptoms and moderate to severe symptoms of depression, including occasional current suicidal ideation without current intent. (R. at 1487.) Stair did not suspect either blatant malingering or subtle symptom amplification. (R. at 1487.) Hubbard reported that, although he was taking clonazepam for anxiety and depression, it was not particularly effective. (R. at 1485.) He stated he saw Burke for several months, but he had never been psychiatrically

hospitalized, and his general physician prescribed his mental health medication. (R. at 1485.) He reported dropping out of school to begin working when his father became ill. (R. at 1486.) Hubbard stated he always had difficulty learning, and he continued to have problems with arithmetic. (R. at 1486.) He was assessed with borderline intellectual functioning, which caused significant limitations with complex understanding and notable limitations with tasks of moderate complexity. (R. at 1487-88.) Stair found Hubbard best suited for relatively noncomplex, repetitive tasks, which, typically, are physically demanding. (R. at 1488.)

On mental status examination, Hubbard was fully oriented; he demonstrated a slightly below average ability to think abstractly; he easily answered simple, logic-based problems; he answered simple elementary mathematical equations; he performed somewhat poorly on Serial 7's due to notable anxiety; short-term memory was intact; he accurately recalled several past presidents; overall thinking patterns appeared somewhat scattered; he had difficulty maintaining a logical and coherent train of thought; he demonstrated a below average degree of higher executive functioning; affect was mostly appropriate throughout, aside from obvious anxiety; hallucinations or delusional beliefs were not reported; rapport was established; attention span was fair to poor; he was responsive to questioning; speech was normal and adequately articulate; and eye contact was good. (R. at 1486-87.) Hubbard's hygiene and grooming were good; he demonstrated good cooperation; he was appropriately dressed; balance, gait and posture were compromised, as he walked rather slowly in a slightly hunched over position; he had to stand several times during the evaluation to stretch his back and legs; after the evaluation, it took him several seconds to stand from the chair; and he continued to walk very slowly across the parking lot to his car. (R. at 1484.)

Hubbard reported that, although he tried to do things around the house, like washing clothes and dishes, he could not, noting he was unable to stand at the sink for more than a few minutes. (R. at 1488.) He described a "good day" as when his pain was "not as high," and he did not get phone calls from bill collectors, while a "bad day" meant he had more depression and anxiety. (R. at 1488.) Hubbard's medical records reflected a diagnosis of anxiety in early 2016; chronic depression and anxiety in December 2016; and severe major depressive disorder and significant anxiety symptoms in January 2018. (R. at 1488-89.) Stair found these diagnoses were consistent with his observations and Hubbard's reported symptomatology. (R. at 1489.) Additionally, Stair noted Hubbard's school records, which showed mostly Ds and Fs through middle school. (R. at 1489.) Both the Miller Forensic Assessment of Symptoms Test, ("M-FAST"), and the Personality Assessment Inventory, ("PAI"), the results of which Stair stated were consistent with his observations and all available history, ruled out the possibility of symptom exaggeration. (R. at 1489.) The PAI results included elevated scales measuring depression, mood instability, anxiety, irritability and suicidal thoughts, indicating at least moderate depression, anxiety and agitation about circumstances. (R. at 1489.) The Wechsler Adult Intelligence Scale – Fourth Edition, ("WAIS-IV"), was administered, yielding a full-scale IQ score of 80, placing Hubbard in the low average range of intellectual functioning. (R. at 1489-90.) His nonverbal reasoning abilities and his ability to process simple or routine visual material without making errors were in the low average range, while his verbal reasoning abilities were in the average range, and his ability to sustain attention, to concentrate and to exert mental control was in the borderline range. (R. at 1490.) Stair stated that Hubbard's scores were consistent with his school struggles, and his standardized achievement scores from school also indicated far below average performance and ability. (R. at 1490.)

Stair diagnosed Hubbard with major depressive disorder, moderate to severe; generalized anxiety disorder, moderate, with mild panic features; and borderline intellectual functioning. (R. at 1491.) He opined Hubbard was mildly impaired in his ability to understand simple information or directions with the capacity to put it to full use in a vocational setting; moderately impaired in his ability to comprehend and implement multi-step, complex instructions; and markedly impaired in his ability to maintain persistence and concentration on tasks for a full workday and workweek, to adapt to changes in the workplace and to engage in social relationships. (R. at 1490-91.)

On July 30, 2019, Stair completed a mental assessment, opining Hubbard was moderately limited in his ability to follow work rules; to understand, remember and carry out simple job instructions; and to maintain personal appearance. (R. at 1492-94.) He opined Hubbard was markedly limited in his ability to relate to co-workers; to deal with the public; to use judgment in public; to function independently; to maintain attention/concentration; to understand, remember and carry out detailed job instructions; to behave in an emotionally stable manner; and to relate predictably in social situations. (R. at 1492-93.) Stair opined Hubbard was extremely limited in his ability to interact with supervisors; to deal with work stresses; to understand, remember and carry out complex job instructions; and to demonstrate reliability. (R. at 1492-93.) He opined Hubbard would miss more than two workdays monthly due to his impairments or treatment. (R. at 1494.) Stair indicated his findings were supported by Hubbard's limitations due to major depressive disorder, generalized anxiety disorder and borderline intellectual functioning, including limitations in his ability to focus, concentrate and remember. (R. at 1493-94.)

*III. Analysis*

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2020). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (2020).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

Hubbard argues that the ALJ's decision is not supported by substantial evidence. (Plaintiff's Memorandum In Support Of His Motion For Summary Judgment, ("Plaintiff's Brief"), at 5-7.) Specifically, he argues that the ALJ improperly determined his residual functional capacity by rejecting the "uncontested

[and] up to date" opinions of Drs. Hines and Baluyot, Templeton, Burke and Stair, instead relying on the "stale [and] outdated" opinions of the state agency reviewers. (Plaintiff's Brief at 7.)

Because this matter involves a claim filed after March 27, 2017, a new regulatory framework applies to the ALJ's evaluation of medical opinions in the record. For applications filed on or after March 27, 2017, the Social Security Administration, ("SSA"), has enacted substantial revisions to the regulations governing the evaluation of opinion evidence. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18, 2017) (technical errors corrected by 82 Fed. Reg. 15132-01, 2017 WL 1105368 (Mar. 27, 2017)). Under the new regulations, ALJs no longer are required to assign an evidentiary weight to medical opinions or to accord special deference to treating source opinions. *See* 20 C.F.R. §§ 404.1520c(a), 416.920c(a) (2020) (providing that ALJs "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources").[16]

Instead, an ALJ must consider and articulate how *persuasive* he finds all of the medical opinions and all prior administrative medical findings in a claimant's

---

[16] The new regulations define a "medical opinion" as "a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions" in the abilities to perform the physical, mental, or other demands of work activity or to adapt to environmental conditions. 20 C.F.R. §§ 404.1513(a)(2), 416.913(a)(2) (2020). Those regulations also define a "prior administrative medical finding" as a "finding, other than the ultimate determination about whether [a claimant is] disabled, about a medical issue made by [the SSA's] Federal and State agency medical and psychological consultants at a prior level of review." 20 C.F.R. §§ 404.1513(a)(5), 416.913(a)(5) (2020).

case record based on the following factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors that tend to support or contradict the opinion. *See* 20 C.F.R. §§ 404.1520c(b), (c)(1)-(5), 416.920c(b), (c)(1)-(5) (2020) (emphasis added). Moreover, when a medical source provides more than one opinion or finding, the ALJ will evaluate the persuasiveness of such opinions or findings "together in a single analysis" and need not articulate how he or she considered those opinions or findings "individually." 20 C.F.R. §§ 404.1520c(b)(1), 416.920c(b)(1) (2020).

In evaluating the persuasiveness of an opinion or finding, the SSA deems supportability and consistency "the most important factors," and, thus, the ALJ must address those two factors in evaluating the persuasiveness of medical opinions or prior administrative medical findings. 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2) (2020).[17] In evaluating the supportability of a medical opinion, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) … the more persuasive the medical opinions … will be." 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1). In assessing the consistency factor, "[t]he more consistent a medical opinion(s) … is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) … will be." 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2).

---

[17] "Supportability" means "[t]he extent to which a medical source's opinion is supported by relevant objective medical evidence and the source's supporting explanation." Revisions to Rules, 82 Fed. Reg. at 5853; *see also* 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1). "Consistency" denotes "the extent to which the opinion is consistent with the evidence from other medical sources and nonmedical sources in the claim." Revisions to Rules, 82 Fed. Reg. at 5853; *see also* 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2).

The new regulations also alter the way the ALJ discusses the medical opinions or findings in the text of the decision. *See* 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2). After considering the relevant factors, the ALJ is not required to explain how she considered each of them. Instead, when articulating her finding about whether an opinion is persuasive, the ALJ need only explain how she considered "the most important factors" of supportability and consistency. *See* 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2). The ALJ may comment on the other factors, including the source's relationship with the claimant, but generally has no obligation to do so. *See* 20 C.F.R. §§ 404.1520c(b)(2)-(3), 416.920c(b)(2)-(3) (2020).

When the ALJ finds two or more opinions or findings about the same issue are both equally well-supported and consistent with the record, but are not exactly the same, the ALJ must consider the most persuasive factors, including the nature and extent of the medical source's relationship with the claimant and area of specialization, as well at the catch-all "other factors that tend to support or contradict a medical opinion or prior administrative medical finding." 20 C.F.R. §§ 404.1520c(b)(3), (c)(3)-(5), 416.920c(b)(3), (c)(3)-(5).

Here, the ALJ found that Hubbard had the residual functional capacity to perform simple, repetitive, unskilled light work, except he could lift or carry 20 pounds occasionally and 10 pounds frequently; stand for six hours in an eight-hour workday; walk for six hours in an eight-hour workday; sit for six hours in an eight-hour workday; push or pull occasionally; never climb ladders, ropes or scaffolds; occasionally balance, kneel, crawl, stoop, crouch and climb ramps or stairs; have occasional interaction with the general public, co-workers and supervisors; he must avoid exposure to hazardous machinery, working at unprotected heights and

working on vibrating surfaces; he could concentrate for two-hour segments with normal breaks as allowed by the employer; he could complete an eight-hour workday and 40-hour workweek; he could respond appropriately to supervision and work situations; and any time off task would be accommodated by normal breaks. (R. at 23.)

In making this residual functional capacity finding, the ALJ applied the new regulations. On November 4, 2017, one-time consultative examiner, Dr. Hines, opined that Hubbard was unlikely to be able to walk and/or stand for a full workday, but might be able to sit for a partial workday with allotted occasional breaks. (R. at 1057.) Because Dr. Hines opined Hubbard's condition may be exacerbated by lifting or carrying excessive weight, he limited him to lifting or carrying less than 10 pounds. (R. at 1057.) Dr. Hines also opined Hubbard should refrain from excessive bending, stooping and crouching. (R. at 1057.) The ALJ found Dr. Hines's opinion was not persuasive because it was more restrictive than warranted by the medical evidence of record. (R. at 30.) In other words, it was not consistent with the other medical evidence of record. Specifically, the ALJ noted that Hubbard had a light, instead of a sedentary, residual functional capacity due to his lumbar spine degenerative disc disease, noting the following evidence. (R. at 30.) After sustaining an L4 compression fracture in April 2013, Hubbard was able to continue working on "light duty" until 2015. (R. at 30.) He received treatment for his back mainly at pain management clinics from 2015 through 2019, and he, generally, was prescribed oxycodone with some benefit. (R. at 30.) Hubbard had no emergency department visits or hospital admissions due to his back pain. (R. at 30.) While physical examinations showed some obvious signs of joint tenderness to the lumbar spine during range of motion, as well as slightly diminished strength in the lower extremities, his gait was normal, he could slowly rise from a sitting position without

assistance, and he could bend with moderate difficulty. (R. at 30.) Although Hubbard
sometimes used a cane, he admitted it was not prescribed. (R. at 30.) Physical
examinations usually showed a normal gait, and Hubbard was not using a cane from
2015 to 2019, the relevant time period to his claims. (R. at 30.)

Additionally, with regard to supportability, the ALJ correctly noted that Dr.
Hines did not clarify what he meant by "excessive" bending, stooping and crouching.
(R. at 30.) *See Baldwin v. Colvin*, 2015 WL 1467050, at *12 (S.D. W. Va. Mar. 30,
2015) (affirming where "The ALJ gave Dr. Apgar's opinion some weight because it
was vague and could not be relied upon … Dr. Apgar's opinion was vague in that
he assessed marked difficulty standing, walking, sitting, lifting, carrying, pushing,
pulling, and traveling. However, he failed to define the term 'marked' and failed to
indicate the extent to which Claimant could perform these activities.") (internal
citation omitted); *Adkins v. Colvin*, 2014 WL 3734331, at *3 (W.D. Va. July 28,
2014) ("Ms. Wilson's opinion is vague and fails to provide any specific limitations
with respect to Plaintiff's ability to sit, stand, walk, stoop, bend, crawl, kneel, lift, or
perform any other activity. … Accordingly, I find that the ALJ's consideration of
Ms. Wilson's opinion was more than adequate, and I will overrule Plaintiff's
Objection."). Here, Dr. Hines similarly spoke of an undefined "excessive" restriction
in the areas of bending, stooping and crouching. Furthermore, the ALJ correctly
noted that Dr. Hines did not regularly treat Hubbard. (R. at 30.) Instead, he
performed a one-time consultative examination at the request of Disability
Determination Services. Finally, as the ALJ noted, Dr. Hines did not have access to
medical records created after the 2017 consultative examination. (R. at 30.) Thus,
for all these reasons, I find that substantial evidence supports the ALJ's finding that
Dr. Hines's opinion was not persuasive.

On February 14, 2018, Dr. Baluyot opined, by checking a box on a Patient Injury And Work Status (Medical Opinion) form, that Hubbard was permanently unable to work. (R. at 1061.) Under the "Additional Comments" section, Dr. Baluyot noted Dr. Hines's report, which found Hubbard completely disabled due to Hubbard's complaints of an inability to walk and stand for a full workday because of back pain. (R. at 1061.) On April 17, 2019, Nurse Practitioner Templeton completed the same form in the same manner. (R. at 1233.) The ALJ found both Dr. Baluyot's and Templeton's opinions were not persuasive for multiple reasons. Specifically, she correctly stated they did not provide a detailed residual functional capacity or limitations. (R. at 30-31.) In fact, these forms contained absolutely no residual functional capacity finding or limitations. (R. at 1061, 1233.) Next, the ALJ correctly stated that Dr. Baluyot and Templeton did not clarify how many hours in an eight-hour workday Hubbard could stand or walk. (R. at 30-31.) Instead, they merely adopted the finding of Dr. Hines that he could not walk and stand for a full workday. (R. at 1061, 1233.) However, as stated above, such vague findings are insufficient. *See Baldwin*, 2015 WL 1467050, at *12; *Adkins*, 2014 WL 3734331, at *3. Additionally, Dr. Baluyot and Templeton appeared to consider only Hubbard's physical impairments and not his mental health issues; and, although Dr. Baluyot and Templeton were Hubbard's pain management providers, they generally only refilled his oxycodone at appointments, and they did not note any physical examination findings. (R. at 30-31.)

In addition to these reasons specified by the ALJ, the court further notes that opinions contained on check-box forms like these are not entitled to great weight. *See Cooper v. Saul*, 2019 WL 6703557, at *10 (W.D. Va. Oct. 29, 2019) (citing *Gerette v. Colvin*, 2016 WL 1296082, at *6 (W.D. Va. Mar. 30, 2016) (form reports, in which a physician's only obligation is to check a box or fill in a blank, are entitled

to little weight in the adjudication process); *Walker v. Colvin*, 2015 WL 5138281, at *8 (W.D. Va. Aug. 31, 2015) (check-box forms are of limited probative value); *Ferdinand v. Astrue*, 2013 WL 1333540, at *10 n.3 (E.D. Va. Feb. 28, 2013) (check-box forms are weak evidence at best); *Leonard v. Astrue*, 2012 WL 4404508, at *4 (W.D. Va. Sept. 25, 2012) (check-box assessments without explanatory comments are not entitled to great weight, even when completed by a treating physician)). Also, Dr. Baluyot's and Templeton's opinions that Hubbard was permanently unable to work are not medical opinions, but dispositive administrative findings that are reserved exclusively to the Commissioner. *See* 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1) (2020). Such opinions are not entitled to any special significance. *See* 20 C.F.R. §§ 404.1527(d)(3), 416.927(d)(3) (2020). Thus, for all these reasons, I find that substantial evidence supports the ALJ's findings that neither Dr. Baluyot's nor Templeton's opinion was persuasive.

Instead, the ALJ found persuasive the opinions of the state agency physicians, Drs. Arenella and Surrusco. (R. at 27.) On November 13, 2017, Dr. Arenella opined Hubbard could perform a range of light work, with no manipulative, visual, communicative or environmental limitations. (R. at 92-93.) On April 21, 2018, Dr. Surrusco also opined Hubbard could perform a range of light work, but he further found Hubbard should avoid concentrated exposure to hazards, humidity and vibration. (R. at 123-25.) The ALJ found these opinions persuasive, as the medical records generally were consistent with a light residual functional capacity, as well as the environmental limitations imposed by Dr. Surrusco. (R. at 27.) In addition to the medical evidence of record cited above in relation to Dr. Hines's opinion, the ALJ also stated that these state agency physicians reviewed medical records available to them at the time they rendered their opinions, and he noted they had experience with the rules and regulations of the disability determination process. (R.

at 27.) Under the regulations, the ALJ properly considered this in evaluating the persuasiveness of Drs. Arenella's and Surrusco's opinions. *See* 20 C.F.R. §§ 404.1513a(3)(b)(1), 416.913a(3)(b)(1) (2020) ("State agency medical or psychological consultants are highly qualified and experts in Social Security disability evaluation."). Hubbard argues that the ALJ should have given the state agency physicians' assessments less weight because they were "stale [and] outdated." (Plaintiff's Brief at 7.) However, "[t]he Social Security regulations impose no limit on how much time may pass between a report and the ALJ's decision in reliance on it." *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011); *see also Stricker v. Colvin*, 2016 WL 543216, at *3 (N.D. W. Va. Feb. 10, 2016) ("[A] lapse of time between State agency physician opinions and the ALJ's decision does not render the opinion stale."). For all these reasons, I find that substantial evidence supports the ALJ's finding that these opinions were persuasive.

Turning to Hubbard's mental impairments, in an April 18, 2018, mental assessment, licensed clinical social worker Burke opined Hubbard was moderately limited in all areas of making occupational, performance and personal/social adjustments, except for maintaining personal appearance, which she deemed only mildly limited. (R. at 979-81.) Burke also opined Hubbard would be absent from work more than two days monthly. (R. at 981.) The ALJ found Burke's opinion not persuasive, as it was slightly more restrictive than warranted by the mental evidence in the record. (R. at 29.) Specifically, the ALJ found that Burke's absenteeism finding was inconsistent with the other record evidence. (R. at 29.) However, she noted Burke's opinion generally was consistent with Hubbard's severe anxiety, depression and borderline intellectual functioning with moderate or mild limitations in the "B" criteria. (R. at 29.) The ALJ noted that Hubbard was diagnosed with depression and anxiety in connection with the loss of his job in 2015. (R. at 29.)

Nonetheless, he usually reported his mental symptoms were controlled with medications, including Klonopin for his anxiety disorder and Lexapro for his depressive disorder. (R. at 29.) Additionally, the ALJ noted that Hubbard attended only a few counseling sessions with Burke in early 2018. (R. at 29-30.) Moreover, he had no voluntary or involuntary psychiatric hospitalizations. (R. at 29.) Testing in 2019 revealed a full-scale IQ score of 80, and mental status examinations reflected Hubbard had an anxious mood and affect, as well as a slightly below average ability to think abstractly, but he easily answered simple logic-based problems and elementary mathematical equations. (R. at 29-30.) While Hubbard performed somewhat poorly on Serial 7 testing, his overall thinking pattern appeared somewhat scattered, he had difficulty maintaining a logical and coherent train of thought, he demonstrated a below average degree of higher executive functioning, and his attention span was rated fair to poor, his short-term memory was intact, and his eye contact was good. (R. at 30.) Lastly, the ALJ correctly noted that, because Burke only treated Hubbard for a few months in early 2018, she did not have access to any treatment records created after that time or to his 2019 testimony. (R. at 30.)

In addition to these reasons discussed by the ALJ, the court also notes that Burke's opinions are contained on a check-box form, which, as stated previously, are not entitled to great weight. *See Cooper*, 2019 WL 6703557, at *10; *Gerette*, 2016 WL 1296082, at *6; *Walker*, 2015 WL 5138281, at *8; *Ferdinand*, 2013 WL 1333540, at *10 n.3; *Leonard*, 2012 WL 4404508, at *4. Also, Burke's opinion is not supported by her own treatment notes. Specifically, despite finding that Hubbard was moderately limited in the vast majority of making occupational, performance and personal/social adjustments, Burke's treatment notes reflect mostly normal mental status findings, including an appropriate or casual appearance; full orientation; intact thought processes; adequate, appropriate or normal eye contact;

-33-

fair, good or normal judgment and insight; no hallucinations, paranoia or delusions; calm and cooperative behavior with regular or normal speech; no psychomotor agitation or retardation; average intellect; no homicidal or suicidal ideations; and a depressed and/or anxious mood with a flat, dysphoric or anxious affect. Lastly, the court notes that Burke failed to specify any medical or clinical findings to support her assessment. Thus, for all these reasons, I find that substantial evidence supports the ALJ's finding that Burke's opinion was not persuasive.

On July 30, 2019, consultative psychological examiner Stair opined Hubbard was either markedly limited or extremely limited in the vast majority of occupational, performance and personal/social adjustments assessed. (R. at 1492-93.) He further opined Hubbard would miss more than two workdays monthly. (R. at 1494.) The ALJ found Stair's opinion was not persuasive, as it was more restrictive than warranted by the mental evidence of record. (R. at 31.) In addition to the record evidence cited above with regard to Burke's opinion, the ALJ further stated that Stair did not regularly treat Hubbard, but examined him on one occasion in 2019, which the court notes is valid reasoning. (R. at 31.) *See Holman v. Astrue*, 2012 WL 2678933, at *7 (M.D. Tenn. May 31, 2012) ("Because Dr. Blevins only examined Plaintiff one time, at the request of his attorney, specifically for the purposes of determining Plaintiff's ability to perform work-related activities, and because his findings were inconsistent with the records of Plaintiff's treating physician, Plaintiff's medical history, and the medical opinions of Drs. Payne and Gregory, the ALJ properly accorded little weight to Dr. Blevins' opinion"). Lastly, the ALJ correctly stated that Stair mainly relied on Hubbard's self-report of mental symptoms in arriving at his opinion. (R. at 31.) However, a claimant's subjective statements of discomfort are insufficient to carry the burden of proof of a medically determinable mental impairment so as to justify disability benefits. Instead, the

claimant also must submit objective evidence determined by medical findings. *See Brady v. Gardner*, 294 F. Supp. 870, 873 (W.D. Va. 1968.) Thus, for all these reasons, I find that substantial evidence supports the ALJ's finding that Stair's opinion was not persuasive.

Moreover, based on the record evidence cited by the ALJ in relation to the persuasiveness of the opinion evidence, I also find that her residual functional capacity assessment is supported by substantial evidence. In sum, this includes evidence that Hubbard continued to work in a light duty position for approximately two years after injuring his back. He received mostly pain management from 2015 to 2019, and he generally was treated with oxycodone, which he repeatedly reported controlled his pain, and which treating providers deemed stable. "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler,* 785 F.2d 1163, 1166 (4th Cir. 1986). He stated on multiple occasions he was working around his house, working in a garden and was able to perform activities of daily living. In January 2017, he reported helping his daughter move into her dormitory. From January to May 2019, Hubbard reported his pain medication relieved his pain by between 60 and 75 percent. In April 2019, he said it was making a real difference in his life. Although physical examinations revealed some obvious signs of joint tenderness and slightly diminished lower extremity strength, Hubbard's gait was normal, he could slowly rise from a seated position without assistance, and he could bend with only moderate difficulty. He admitted that, although he sometimes used a cane, it was not prescribed, and he was not using it during the relevant time period from 2015 to 2019.

With regard to Hubbard's mental impairments, despite his diagnoses of depression and anxiety in connection with his job loss in 2015, he usually reported

-35-

his mental symptoms were controlled with medication. *See Gross*, 785 F.2d at 1166. Dr. Hines's November 2017 consultative examination included the following findings: that Hubbard was alert and fully oriented; he was cooperative; he did not appear depressed or anxious; he communicated without deficits; recent and remote memory were intact; insight and cognitive functioning were good; there were no signs of mood instability or concentration difficulty; and he was able to hold a conversation, respond appropriately to questions and remember instructions. The record also shows that the only mental health treatment Hubbard received during the relevant time to his claims was a few counseling sessions with Burke in early 2018. These treatment notes reflect normal mental status examinations, including adequate grooming; full orientation; intact thought process; fair to good judgment and insight; regular speech; adequate eye contact; calm and cooperative behavior; no psychomotor agitation or retardation; no hallucinations, paranoia or delusions; average intellect; and no suicidal or homicidal ideations. Hubbard's mood during his treatment with Burke was described as mildly depressed, depressed, mildly anxious and anxious, while his affect was described as flat, dysphoric, mildly depressed, and mildly anxious. In January and February 2019, at pain management appointments, Hubbard was described as clean and groomed, alert and fully oriented, and he answered questions appropriately. In March, April and May 2019, in addition to these same observations, it also was noted that Hubbard had an appropriate affect. Lastly, Hubbard admitted he had never sought emergency psychiatric treatment or been psychiatrically hospitalized.

For all of the above-stated reasons, I find that substantial evidence exists to support the ALJ's evaluation of the opinion evidence, as well as her finding as to Hubbard's residual functional capacity. Thus, I find substantial evidence exists to support the ALJ's finding that Hubbard was not disabled.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1.     Substantial evidence exists in the record to support the ALJ's evaluation of the opinion evidence;

2.     Substantial evidence exists in the record to support the ALJ's residual functional capacity finding; and

3.     Substantial evidence exists in the record to support the Commissioner's finding that Hubbard was not disabled under the Act and was not entitled to DIB and SSI benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Hubbard's motion for summary judgment and grant the Commissioner's motion for summary judgment.

## <u>Notice to Parties</u>

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also

receive further evidence or recommit the matter to the magistrate judge
with instructions.

Failure to file timely written objections to these proposed findings and
recommendations within 14 days could waive appellate review. At the conclusion
of the 14-day period, the Clerk is directed to transmit the record in this matter to the
Honorable James P. Jones, Senior United States District Judge.

The Clerk is directed to send certified copies of this Report and
Recommendation to all counsel of record at this time.

DATED:      November 3, 2021.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE